FRED W. ROGERS, JR., AND FLORA M. ROGERS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; LARRY J. ROGERS AND S. AUDREY ROGERS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rogers v. Rogers
Docket Nos. 4583-89, 4875-89
United States Tax Court
T.C. Memo 1991-148; 1991 Tax Ct. Memo LEXIS 167; 61 T.C.M. (CCH) 2310; T.C.M. (RIA) 91148; April 3, 1991, Filed *167 Decisions will be entered under Rule 155. Michael G. Parham, for the petitioners. Clinton M. Fried, for the respondent. SCOTT, Judge. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in the income tax of Fred W. Rogers, Jr., and Flora W. Rogers and additions to tax for the years and in the amounts as follows: Additions to Tax, I.R.C. Sections
Year
Deficiencies
6653(b)(1) [1]*
6653(b)(2)
6661
1985
$ 69,043
$ 34,521
to be determined
$ 17,261
1986
7,326
5,484
to be determined
1,831
Respondent in his notice of deficiency determined a deficiency in the income tax of Larry J. and S. Audrey Rogers for the calendar year 1985 and additions to tax under the indicated sections as follows: *168   Additions to Tax, I.R.C. Sections
Year
Deficiency
6653(b)(1)
6653(b)(2)
6661
1985
$ 62,819
$ 31,409
to be determined
$ 15,705
and determined a deficiency and additions to tax under the indicated sections in the income tax of Larry J. Rogers for the calendar year 1986 as follows: Additions to Tax, I.R.C. Sections
Year
Deficiency
6653(b)(1)(A)
6653(b)(1)(B)
6661
6654
1986
$ 171,069
$ 128,302
to be determined
$ 42,079
$ 20
By amendment to answer respondent claimed increased deficiencies alleging that the proper total deficiency and additions to tax for Larry J. and S. Audrey Rogers for the calendar year 1985 were as follows:     Additions to Tax, I.R.C. Sections
Year
Deficiency
6653(b)(1)
6653(b)(2)
6661
1985
$ 764,405
$ 382,203
to be determined
$ 191,101
and for Larry J. Rogers for the calendar year 1986 were as follows: Additions to Tax, I.R.C. Sections
Year
Deficiency
6653(b)(1)(A)
6653(b)(1)(B)
6661
6654
1986
$ 769,135
$ 576,851
to be determined
$ 192,284
$ 20
The issues for decision are: (1) The amount of taxable income that Larry J. and S. Audrey Rogers had for the calendar *169 year 1985 and that Larry J. Rogers had for the calendar year 1986, (2) whether any part of the underpayment in income tax of Larry J. and S. Audrey Rogers for the calendar year 1985, and, if so, what part was due to fraud on the part of each or either of them and whether any part of the underpayment in tax of Larry J. Rogers for the year 1986, and, if so, what part was due to fraud, (3) whether the addition to tax for substantial understatement under section 6661 is applicable to the deficiency in tax of Larry J. and S. Audrey Rogers for the calendar year 1985 and to the tax of Larry J. Rogers for the calendar year 1986, (4) whether the addition to tax under section 6654 for failure to make estimated tax payments is applicable to the deficiency of Larry J. Rogers for the year 1986, (5) whether petitioners Fred W. Rogers, Jr., (sometimes referred to at the trial as Junior Rogers) and Flora M. Rogers understated the amount of their taxable income for each of the years 1985 and 1986 and, if so, whether any part of the resulting underpayment was due to fraud, and, if so, what part, and (6) whether there was a substantial understatement of income tax by Fred W. Rogers and Flora M. Rogers *170 for each or either of the years 1985 and 1986, which is subject to the addition to tax under section 6661. FINDINGS OF FACT Petitioners, Fred W. Rogers, Jr., and Flora M. Rogers, husband and wife, who resided in Ellijay, Georgia, at the time they filed their petition in this case filed joint Federal income tax returns for the calendar years 1985 and 1986 with the Atlanta Internal Revenue Service Center. Their mailing address was P.O. Box 2, Cherry Log, Georgia. They reported their income on the cash basis. Petitioners, Larry J. Rogers and S. Audrey Rogers, are husband and wife. Larry J. Rogers resided in Atlanta, Georgia, and S. Audrey Rogers resided in Jonesboro, Georgia, at the time of the filing of their petition in this case. They reported their income on the cash basis on a joint Federal income tax return filed for the calendar year 1985 with the Atlanta Internal Revenue Service Center. Larry J. Rogers and S. Audrey Rogers filed no Federal income tax return for the year 1986. In 1981 Larry J. and S. Audrey Rogers acquired the Greenwood Hotel located in Atlanta, Georgia, from Larry J. Rogers' great-aunt Lela Smith. They received a warranty deed executed on January 12, *171 1981, and recorded on April 29, 1981. The purchase agreement provided for a payment of $ 300,000 for the hotel. Larry J. and S. Audrey Rogers made a $ 10,000 down payment on the hotel and were to pay $ 1,000 per month on the $ 290,000 balance due. A later document reduced the monthly payment to $ 500. Neither instrument provided for the payment of interest on the unpaid portion of the purchase price. By a quit-claim deed recorded May 4, 1983, in Fulton County, Georgia, Lela Smith transferred the Greenwood Hotel to Larry J. and Audrey Rogers. The quit-claim deed stated that "This conveyance is made to show payment in full of the indebtedness to grantor by Larry J. Rogers as recorded in Deed Book 7781, page 454, Fulton County Records, the original security deed having been lost and this constituting full satisfaction of all obligations thereunder." There is no showing in the check registers of the Greenwood Hotel that any payments on the alleged purchase price other than the $ 10,000 down payment were ever made. No gift tax returns were filed with respect to the transfer of the Greenwood Hotel. Larry J. Rogers was born June 29, 1951, and he and S. Audrey Rogers were married *172 in 1970. Before they moved to Atlanta, they maintained a checking account and a savings account in Ellijay, Georgia. They did not have assets of over $ 25,000 when they moved to Atlanta. S. Audrey Rogers kept the books of the Greenwood Hotel from the time that she and Larry J. Rogers began to operate it in 1981, until it was seized in connection with a drug arrest of Larry J. Rogers in late 1986. S. Audrey Rogers would take the books of the Greenwood Hotel and other items relating to her income and her husband's income to a tax return preparer to prepare the joint returns she filed with her husband, Larry J. Rogers, for the years 1981 through 1985. The Greenwood Hotel consisted of motel-type rooms and a trailer park. The following schedule shows the adjusted gross income, taxable income, and tax as shown on the joint tax returns of Larry J. and S. Audrey Rogers for the calendar years 1981 through 1985. Adjusted
Year
Gross Income
Taxable Income
Tax
1981
$  2,667
$ (1,333)
$   248
1982
6,926
(2,926)
648
1983
10,947
6,947 1,440
1984
10,229
6,229 1,470
1985
18,404
14,277 3,657
Total
$ 49,173
$ 23,194 $ 7,463
In late 1985, the organized crime *173 section of the Atlanta Police Bureau (APB) began an investigation into alleged illegal activities at the Greenwood Hotel. Prior to initiating the formal investigation, Detective Hugh L. Bowen had spoken to Larry J. Rogers and warned him to stop selling dilaudid, stating that he had received numerous complaints centering on this activity at the Greenwood Hotel. The Federal Drug Enforcement Administration (DEA) joined in the investigation of the activities of Larry J. Rogers at the Greenwood Hotel in August 1986. During the years 1981 through 1986, while the Greenwood Hotel was operated by Larry J. and S. Audrey Rogers there had been a number of instances involving arrests for various alleged crimes at the hotel. The police register in Atlanta shows a number of arrests for sex offenses including prostitution, buying and selling stolen goods and illegal drugs, and at least one charge of murder. While the APB and the DEA were monitoring the Greenwood Hotel they would arrange to have individuals who were buying drugs at the hotel wear a body transmitter and recorder, which would record conversations relating to drug transactions. Larry J. Rogers threatened certain individuals, that *174 he suspected of being police informants, with physical harm. The largest purchase of dilaudid pills recorded on a body transmitter and recorder worn by a purchaser who was assisting the APB and DEA investigators, which involved Larry J. Rogers, was a sale by Larry J. Rogers to the purchaser of 100 dilaudid pills for $ 3,500. Generally, Larry J. Rogers sold these pills for $ 40 each. Dilaudid is a powerful narcotic and is a controlled substance prescribed for the management of severe pain. It can be injected or ingested orally. It is considered a synthetic substitute for heroin and is highly addictive. Larry J. Rogers bought dilaudid from various individuals including James Parrott. Mr. Parrott would go to various doctors complaining of severe pain and obtain a prescription for dilaudid pills and would then sell some of those pills to Larry J. Rogers. He would also visit the Greenwood Hotel to buy pills from Larry J. or S. Audrey Rogers. James Parrott sold dilaudid pills to Larry J. Rogers for $ 23 per pill, but Larry J. Rogers at times paid less than the amount he paid to James Parrott for such pills. James Parrott on a number of separate occasions, purchased pills from *175 S. Audrey Rogers. S. Audrey Rogers did the renting of rooms at the Greenwood Hotel and at times rented such rooms on an hourly basis. While operating the Greenwood Hotel, Larry J. and S. Audrey Rogers would alternate the task of cleaning the hotel rooms. At the time of the seizure of the Greenwood Hotel, law enforcement officials found 50 empty dilaudid vials and numerous discarded syringes. Prior to the seizure of the hotel, these officials observed discarded syringes on the grounds of the Greenwood Hotel. Larry J. Rogers maintained no records of the income he derived from the sale of illegal drugs. He did not provide any information to S. Audrey Rogers regarding the income from drugs and S. Audrey Rogers did not furnish any information as to income from the sale of illegal drugs to the person who prepared the joint Federal income tax returns, which she filed with Larry J. Rogers. No income from the sale of dilaudid tablets or any other illegal drug was included in the income as reported by Larry J. and S. Audrey Rogers on their 1985 Federal income tax return. In late 1986, Larry J. Rogers was arrested for illegal drug sales. He was indicted on several Federal narcotic charges. *176 In 1987, Larry J. Rogers entered a plea of guilty to the various narcotic charges and received a prison sentence of 25 years. At the time of trial, he was incarcerated in the United States Penitentiary in Atlanta, Georgia. During his interview with the United States Attorney, Larry J. Rogers admitted selling dilaudid and hiding drugs at various places at the Greenwood Hotel. He also named a number of individuals from whom he stated he purchased large quantities of dilaudid. After Larry J. Rogers' arrest, the Greenwood Hotel was seized and searched. During the search $ 11,000 in cash was found at the hotel. Prior to moving to Atlanta from Ellijay, Georgia, Larry J. Rogers was employed as a truck driver and S. Audrey Rogers in 1972, and for some years prior thereto, was an employee of Levi Strauss in Ellijay, Georgia. She did not work for a salary after 1972. Larry J. and S. Audrey Rogers had two children, a girl Buffi, who was 9 years old sometime in 1981, and a son Nikki, who was 5 in that year. After Larry J. and S. Audrey Rogers moved to the Greenwood Hotel in 1981 their two children lived with them in a mobile home parked at the hotel. However, Buffi and Nikki attended *177 the Riverdale Schools in Clayton County, rather than the Fulton County Schools. S. Audrey Rogers gave her sister's address in Clayton County to school official as the address of Buffi and Nikki to enable them to attend the Riverdale schools, although Buffi and Nikki did not live at her sister's home. In 1982 Larry J. and S. Audrey Rogers purchased a double-wide mobile home for between $ 20,000 to $ 21,000 in cash. In August 1986, Larry J. and S. Audrey Rogers purchased a home in Riverdale, Georgia, for $ 199,500. They paid for the purchase of this home in cash. Prior to the settlement on the purchase of this home, S. Audrey Rogers went to Gilmer County and visited with Larry J. Rogers' father and his wife. When this house was seized and searched after Larry J. Rogers' arrest, a large quantity of jewelry and $ 61,000 in cash was found in a bucket which Buffi Rogers was attempting to carry from the house covered by pompons which she used as a cheerleader at her school. In 1986 Larry J. and S. Audrey Rogers purchased $ 13,796.11 worth of furniture from Rhodes Furniture Store for their Riverdale residence and paid for these purchases with cash. The invoices were divided between *178 the names of Larry J. Rogers and S. Audrey Rogers so that neither invoice would exceed a cash transaction of $ 10,000 or more. In July 1986, Larry J. Rogers purchased a 1986 Chevrolet Truck for $ 15,938.73. During the years 1983 through 1986 he also acquired numerous other vehicles purchased primarily for cash, including 11 automobiles or trucks and three motorcycles. These vehicles had a cost in excess of $ 79,439.10. During the years 1984, 1985, and 1986, Larry J. and S. Audrey Rogers made numerous cash purchases of jewelry. In April 1985, Larry J. and S. Audrey Rogers purchased a 1985 Chevrolet Truck with cash in the amount of $ 14,256.77. They refused to give the dealer their social security numbers for inclusion on the Form 8300, Report of Cash Payment Over $ 10,000 Received in a Trade or Business, and gave their address as Box 2, Highway 5, Cherry Log, Georgia, Gilmer County. In 1984 Larry J. Rogers purchased a ski boat for $ 8,000 cash and placed the boat in the names of his children, Buffi and Nikki. Larry J. Rogers frequently carried large sums of cash on his person. In 1985 and in 1986, until it was deeded to Larry J. and S. Audrey Rogers in January of the latter *179 year, Fred W. Rogers owned a piece of property in Gilmer County consisting of approximately 250 acres and the family homeplace. He acquired this property through the settlement of the estate of his Uncle Woodrow Wilson Green who died on June 21, 1983, at the age of 67. At the time of his death, Woodrow Wilson Green was living at the Greenwood Hotel in Atlanta, Georgia. The will of Woodrow Wilson Green executed in 1974 produced by Fred W. Rogers for probate left the farm to his nephew, Fred W. Rogers. However, other heirs of Woodrow Wilson Green produced a will of Woodrow Wilson Green executed subsequent to 1974 leaving the farm to them and contested the will which Fred W. Rogers probated. Fred W. Rogers paid a total of $ 80,000, $ 20,000 each to the four other heirs in settlement of their claims, in order to obtain the farm. This settlement occurred in 1983. The settlement agreement was reached at the Greenwood Hotel. Fred W. Rogers had $ 20,000 bank checks issued to each of the four other heirs from $ 80,000 in cash he produced for that purpose. By deed dated January 13, 1986, and recorded on April 4, 1986, Fred W. Rogers deeded the Gilmer County farm, which he had received *180 from Woodrow Wilson Green's estate, to Larry J. and S. Audrey Rogers. In the deed, Fred W. Rogers retained a life estate in the property and structures. No gift tax return was filed for this transfer. Except for his signature, Fred W. Rogers can neither read nor write. During 1985 and continuing into 1986, a house was built on the farm property next to the old family homeplace. This house is sometimes referred to as the Gilmer County house. Fred W. Rogers did much of the work in constructing the house. The money spent in constructing this house was primarily cash. However, Flora Rogers kept a record of the expenses for the house. The record contains invoices for building supplies and other items used in the construction of the house. The records kept by Flora Rogers reflect that a total of $ 177,514 was spent on this residence during the years 1985 and 1986 with approximately 77 percent being spent in 1985 and 23 percent in 1986. Larry J. Rogers directed a man named Kenny Childs to perform air-conditioning and heating labor on this Gilmer County house in exchange for his overdue rent at the Greenwood Hotel. The value of Childs' labor was not included in Larry J. and S. *181 Audrey Rogers' reported income in 1985. In 1985 Larry J. Rogers purchased two air conditioners that were installed in the Gilmer County residence. Larry J. Rogers also furnished other materials for the house in Gilmer County. Some framing lumber, which was seen at the Greenwood Hotel and was suspected by the police of being stolen lumber, was transported to Gilmer County on Fred W. Rogers' truck. In 1984 S. Audrey Rogers purchased a one-half interest in a piece of property in Fannin County, Georgia, which she still owned at the time of the trial of this case. Lela Smith, Larry J. Rogers' great-aunt, died on April 27, 1986, at the age of 88. She lived until her death in a small cottage at the Greenwood Hotel. Her husband, Charles H. Smith, had died on August 4, 1970, leaving an estate consisting of real estate valued at $ 143,500 (the Greenwood Hotel), stocks and bonds valued at $ 33,725.93, mortgages, notes, and cash valued at $ 38,851.39, jointly owned property valued at $ 5,500, for a total estate valued at $ 221,577.32. The Georgia intangible tax returns filed for the years 1982 through 1986 by Lela G. Smith show the following: Money on
Hand and
Year
Deposit
Checking
CDs
Stock
Bonds
1982
$  44,500.00
$ 47,348.00
$ 3,600.00
1983
64,310.00
$ 13,310.00
$ 51,000.00
43,614.00
1984
102,154.05
56,597.00
1985
260,553.00
42,844.00
4,540.00
1986
255,184.00
42,777.68
5,860.00
*182 Lela Smith's balances at Merrill Lynch at year-end until her death in 1986 show the following: 1983
1984
1985
1986
$ 56,577
$ 47,384
$ 52,775
$ 50,090
Lela Smith's ending bank balances for the years 1983 through 1985 from her accounts at Georgia Federal and First Atlanta were as follows: 12/31/83
12/31/84
9/30/85
Ga. Federal
$ 68,504.73
$ 104,541.73
$ 134,361.09
First Atlanta
19,825.96
27,656.54
172,948.69
Total
$ 88,330.69
$ 132,198.27
$ 307,309.78
Lela Smith's income tax returns for the years 1981 through 1985 were prepared by Leah Stebbins, an income tax return preparer. Ms. Stebbins prepared these returns from information supplied to her by Lela Smith. Leah Stebbins believed the information she received from Lela Smith was accurate. Based on the information she obtained from Lela Smith for preparation of her tax returns, Leah Stebbins estimates that for the entire period 1981 through 1986 Lela Smith's total receipts from all sources, including taxable and nontaxable income, were approximately $ 200,000. An analysis of a notebook maintained by Lela Smith with S. Audrey Rogers' help shows that in 1985 and 1986 Lela Smith received *183 interest and dividends of $ 28,069.89 and $ 22,915.20, respectively, and social security benefits of $ 3,555 and $ 2,202, respectively. There is no record of receipt of any payments on the Greenwood Hotel. In 1985 Lela Smith received a tax refund of $ 1,539. According to the receipt book kept by Lela Smith she received $ 33,163.89 in 1985 and $ 25,253.20 in 1986 in disposable funds. Lela Smith had owned a certificate of deposit jointly with her brother, Woodrow Wilson Green in the amount of $ 51,154. At some time after Woodrow Wilson Green's death, the certificate of deposit was transferred into the name of S. Audrey Rogers. Lela Smith's will was admitted to probate on July 7, 1986. It named Larry J. and S. Audrey Rogers as executors. The will recited that the Greenwood Hotel had been sold to Larry J. and S. Audrey Rogers and that Lela Smith was living in a house on the hotel grounds rent free and if she was permitted to continue to live there rent free, the remaining amount due on the note given by Larry J. and S. Audrey Rogers, as part of the purchase price of the hotel, was forgiven. Lela Smith also left to Larry J. and S. Audrey Rogers the contents of her house on the *184 Greenwood Hotel grounds. The will provided that each of five heirs, Marry Sue Whitaker, Bobbie Green Crockett, Gusta Green Rogers, Ada Green Rogers, and Sally Sharpe was to receive a one-fifth interest in all of Lela Smith's cash, certificates of deposit, and bank accounts. The stocks held by Lela Smith at Merrill Lynch at the date of her death were left in trust for the benefit of Buffi and Nikki Rogers. S. Audrey Rogers made cash distributions to the five heirs named in Lela Smith's will of $ 25,000 each in 1987 and $ 19,656 each in 1990. No estate tax return was filed for Lela Smith's estate. Respondent in his notice of deficiency computed the income of Larry J. and S. Audrey Rogers for the calendar year 1985 and for Larry J. Rogers for the calendar year 1986 on a source and application of funds basis. The computations were as follows: 1985
Larry J. and S. Audrey Rogers
Application of funds during this taxable year
Lela Smith Payments
$   6,000
Schedule C Expenses
63,975
Ten Year Property
Purchased
9,000
Federal Tax Paid - 1984
1,553
State Tax Paid - 1984
119
Chevy C-10 Truck
14,257
Personal living expenses
11,889
Construction of
Gilmer County house
136,686
Total application of funds
$ 243,479
Total sources of funds
95,537
*185 Understatement of adjusted gross income $ 147,942
1986
Larry J. Rogers
Application of funds during this taxable year
8412 Carlton Drive House
*$ 199,500
1986 Chevy Truck
15,939
Gilmer County House
40,828
Auto Renovations
9,066
Cash Seized by DEA
61,020
Personal living expenses
12,163
1985 State and Federal
Tax Paid
4,297
Jewelry Seized
7,500
Total application of funds
$ 350,313
Sources of funds-decrease
in bank accounts
3,114
(no return filed)
Understatement of adjusted gross income $ 347,199 Except for claiming the source of the funds to be cash gifts and contending that the payment for construction of the Gilmer County house was not made by them, petitioners agree with this computation of respondent. Respondent at the trial filed an amendment to answer claiming an increased deficiency based on an estimate by an APD officer *186 and a DEA officer that Larry J. Rogers sold dilaudid pills for which he had paid $ 23 for $ 40 each to 50 customers a day with an average sale of five pills per customer per day. On this basis respondent computed gross income for Larry J. and S. Audrey Rogers in 1985 of $ 1,551,250 and a gross income for Larry J. Rogers in this same amount for 1986. Based on this gross income respondent claimed increased deficiencies and additions to tax. Fred W. Rogers, Jr., had been married prior to his marriage to Flora M. Rogers. Mr. Rogers' first wife, Billie Geneva Rogers died in an automobile accident in February 1978. In a lawsuit growing out of this accident, the plaintiffs, Fred W. Rogers, Larry J. and Shelia L. Rogers, received a judgment of $ 35,000, of which the sum of $ 26,800 was collected from Georgia Farm Bureau Mutual Insurance Company on June 5, 1979. A part of the payment went to pay attorney's fees. In 1982, Fred W. Rogers acquired a restaurant known as J.R.'s Restaurant from Roger Holloway. In 1984 Fred W. Rogers rented out the restaurant and received rental income. On May 7, 1988, Mr. Rogers reopened the restaurant as his own business. In 1986 Flora M. Rogers sold *187 real estate located in Fannin County, Georgia, to Charles Jimmy Sisson for the sum of $ 100,000, payable with a down payment of $ 10,000 and a $ 90,000 note payable over a 10-year period at an interest rate of 12 percent per annum, producing a payment of $ 1,291.25 per month. Charles Jimmy Sisson, who purchased Mrs. Rogers' property, owned a business in Gilmer County known as Sisson Log Homes. Fred W. Rogers bought items from Mr. Sisson, but bought no framing lumber for the house built on the farm in Gilmer County. On one occasion, Fred W. Rogers paid for items purchased at Sisson Log Homes with $ 10,000 of money which appeared to have been water damaged. Fred W. Rogers sold a person by the name of Claude Bell a front-end loader for $ 5,000. During 1985 and 1986 Claude Bell did carpentry work on the house being built in Gilmer County for a $ 7 per hour wage. The amount which would have been owed to Claude Bell for his carpentry work was credited against the $ 5,000 Claude Bell owed to Fred W. Rogers for the front-end loader purchase. During the years here in issue, Fred W. Rogers was not employed at a salaried job. For some years prior to the years here in issue, he had worked *188 at a carpet mill. The maximum salary he made while working at the carpet mill was between $ 16,000 to $ 18,000 per year. On September 22, 1983, Fred W. Rogers took out an 18-month certificate of deposit at the Bank of Ellijay. The face amount of the certificate was $ 61,000 and the interest rate was 10.40 percent. When this certificate became due on March 22, 1985, it was rolled over into a new certificate of deposit for the same face amount dated April 1, 1985, paying 10.20-percent interest. The maturity date of the rolled-over certificate was October 1, 1986. On October 3, 1986, the proceeds from the certificate taken out on April 1, 1985, were rolled over into another certificate with a face amount of $ 70,000 and an interest rate of 7.5 percent. The maturity date of this certificate was April 3, 1988. All of the certificates described above paid interest to Fred W. Rogers on a monthly basis. In addition to certain purchases made by Fred W. Rogers for the house in Gilmer County from Mr. Sisson and payments he made to Claude Bell, he purchased marble and cultured marble bathroom fixtures from C & D Cultured Marble located in Rossville, Georgia, in February 1986, for the *189 sum of $ 11,400. S. Audrey Rogers helped her father-in-law select these fixtures. When these fixtures were delivered to Fred W. Rogers by Mr. Don Apperson, owner of C & D Cultured Marble, Mr. Rogers took $ 10,000 in cash from a freezer in his kitchen and paid Mr. Apperson with the cash. Fred W. Rogers told one of respondent's agents that the expense records kept by his wife for the Gilmer County house were inflated in order to obtain increased insurance coverage. In fact, the records kept by Mrs. Rogers compare reasonably accurately with invoices for the various purchases in connection with the construction of the house. Fred W. Rogers told a DEA agent and an Atlanta police officer that Mr. Sisson gave him a special price on purchases from his store on account of a land sale he had helped arrange for Mr. Sisson. In fact, Fred W. Rogers received the regular customer discount on purchases from Mr. Sisson's store. When Fred W. Rogers' farm was searched by DEA and Atlanta police department officers, no drugs were found on the farm or about the house. Trained dogs used by the DEA to assist in detecting drugs were run over the farm at the time of the search. At one time these dogs *190 responded positively to a pocket found in a pile of hay located on Fred W. Rogers' farm in Gilmer County, but no drugs were found in the pocket. Fred W. and Flora M. Rogers on their income tax return for the years 1982 through 1986 reported adjusted gross income (AGI), taxable income (TI), and Federal tax liability (TAX) for the years 1982 through 1986 as follows: Year
AGI
TI
TAX
1982
$ 17,725
$ 15,225
$ 1,866
1983
5,820
3,820
47
1984
5,774
3,774
41
1985
6,569
4,044
53
1986*
13,161
11,001
961
Total
$ 49,049
$ 37,864
$ 2,968
Woodrow Wilson Green filed no Federal income tax returns after 1974. In 1983 when he died, he owned a 1966 Ford automobile. Fred W. Rogers had assisted Woodrow Wilson Green in his farming activities, but very little income was earned from these farming activities. During the years 1951 through 1973 Woodrow Wilson Green reported total earnings of $ 41,505.76. The highest earnings reported by him in any one year being *191 in 1966 when he reported $ 3,445. Woodrow Wilson Green received no wages after 1973. He began receiving social security benefits in October 1976, which he continued to receive until his death in June 1983. The total amount he received during this period as social security benefits was $ 16,465. His monthly benefits ranged from a low of $ 152 from 1976 to June 1977, to $ 263.50 from June 1982 through June 1983. Respondent in his notice of deficiency to Fred W. and Flora M. Rogers for the years 1985 and 1986 computed their income on a source and application of funds basis. The following schedule shows the computation as made by respondent: 1985
Application of funds during this taxable year
Increase in bank accounts
$  17,647
Personal living expenses
20,512
Construction of Gilmer County house
136,686
Total application of funds
$ 174,845
Sources of funds during this taxable year
Interest income
$  9,256
Rental income
2,100
Total sources of funds
$ 11,356
Understatement of adjusted gross income $ 163,489 1986
Application of funds during this taxable year
Personal living expenses
$ 13,886
Construction of Gilmer County house
40,828
Purchase of livestock
1,050
Legal expenses
25,000
Total application of funds
$ 80,764
*192 Sources of funds during this taxable year
Interest income
$  9,198
Rental income
2,880
Sale of mobile home
3,200
Payments from Jim Sisson
7,747
Sale of personal residence-downpayment
10,000
Decrease in bank accounts
24,542
Total sources of funds
$ 57,567
Understatement of adjusted gross income $ 23,197 Respondent also determined that the understatement of income by Fred W. and Flora M. Rogers was due to fraud and determined an addition to tax for fraud. For each of the years 1985 and 1986 respondent also determined that Fred W. Rogers and Flora M. Rogers were liable for the addition to tax under section 6661 for substantial understatement of tax. OPINION Larry J. and S. Audrey Rogers contend that even though Larry J. Rogers admittedly was in the drug selling business, he had no appreciable income from that business and that the under-reporting of their income, if any, for the year 1985 was very small and not due to fraud. Petitioners contend that Larry J. Rogers' failure to report income for 1986 was due to his oversight after his arrest and not to fraud. Whether a portion of an understatement of income tax by a taxpayer is due to fraud is a question of *193 fact which must be determined from the record as a whole. , affd. without opinion, . It is incumbent on respondent to prove that a portion of the underpayment is due to fraud by clear and convincing evidence. . Fraud must be clearly established and is never presumed. A mere suspicion is insufficient to establish the existence of fraud. . However, fraud may be, and most often is, proved by circumstantial evidence since rarely is direct evidence of intent available. . Numerous cases have set forth some of the indicia of fraud. These indicia of fraud include understatement of income, failure to maintain adequate records, failure to file returns, concealment of assets, engaging in illegal activities, dealing in large amounts of cash, and implausible or inconsistent explanations of behavior. , *194 affg. a Memorandum Opinion of this Court; . Based on the above criteria for determining fraud and the record in this case, we conclude that a portion of the understatement of income in 1985 by Larry J. and S. Audrey Rogers was clearly due to fraud on the part of Larry J. Rogers and Larry J. Rogers' failure to file a return and report income in 1986 was due to fraud. The record shows that Larry J. Rogers was convicted of dealing in drugs, primarily sales of dilaudid pills. In fact, he admitted having been engaged in the sale of drugs from 1984 forward and there is some indication in the record that his drug selling activity started as early as 1981. Larry J. Rogers also admitted that no income from his sale of drugs was reported on his income tax return for 1985. He testified that he "blew" the money he got from selling drugs. His statement was that he spent the money he derived from the sale of drugs on various forms of "high-living", including spending money on various women. His explanation was evidently intended to indicate that none of the money he and S. Audrey spent on jewelry, automobiles, houses, furniture *195 and similar items came from his drug operation. While we do not believe the testimony of Larry J. Rogers or S. Audrey Rogers with respect to the source of the funds spent by them in the years here in issue and for some prior years, it is clear that even if true, the fact that Larry J. Rogers squandered his income from drug activities does not excuse his failure to report that income on his Federal income tax return and pay income tax on it. On the basis of the evidence here, clearly a portion of the understatement of income by Larry J. Rogers in 1985 and his failure to report income in 1986 was due to fraud. The evidence is likewise clear that a portion of the understatement of income by Larry J. and S. Audrey Rogers in 1985 was due to fraud on the part of S. Audrey Rogers. We have concluded from the evidence as a whole that S. Audrey Rogers was aware of the fact that her husband was dealing in drugs. She kept the books of the hotel. She arranged for the preparation of the joint Federal income tax returns. She knew that all income she or her husband received was to be reported. She did not report any income from her husband's drug dealings. She made no effort to ascertain *196 the amount of such income. She denies that she knew of her husband's drug dealings. However, the testimony of Mr. James Parrott, which we believe, was that at times he actually bought pills from S. Audrey Rogers or paid her for pills he bought or received pay from her for pills he sold to her husband. There was no reason for Mr. Parrott to testify to this effect if the testimony was not true and we believe his testimony. It is clear that S. Audrey Rogers knew of her husband's drug sales. We have concluded that petitioners' contention that Mr. Parrott, who was convicted of illegal drug activities at approximately the same time as Larry J. Rogers, had an incentive to testify favorably to the Government with the possibility of shortening his actual stay in the penitentiary is without merit. Also, considering his testimony as a whole, we find it credible. Mr. Parrott was given no promise of any favorable consideration in return for his testimony. The testimony of the APB officer and DEA officer also support a finding that S. Audrey Rogers was aware of the drug business carried on by her husband. Both of these officers testified to the constant drug purchasers coming and going *197 from the hotel, to the numerous police department reports with respect to illegal activities at the hotel, and to the physical evidence around the rooms and grounds of the hotel with respect to drug activities. We conclude from the record as a whole, that the evidence is clear and convincing that S. Audrey Rogers was aware of Larry J. Roger's sale of drugs and that he received the income from those sales. Although she was responsible for having the income tax returns prepared, she got no information from her husband or from any other source with respect to her husband's income from drug related activities and reported no income from this source on their joint Federal income tax return for 1985. Considering the evidence as a whole, we conclude that income from drug sales was omitted from the income reported by Larry J. and S. Audrey Rogers in 1985 with intent on the part of S. Audrey Rogers to evade tax and that the underpayment in tax for the year 1985 is due to fraud on the part of S. Audrey Rogers. Although the burden is on respondent to establish fraud, which we have concluded he has done by clear and convincing evidence, the burden to show error in his determination of tax *198 liability in the deficiency notice is on petitioners. Petitioners concede that the computation of source and application of funds as made by respondent in the notice of deficiency is correct except as to payments on the construction of the Gilmer County home and cash gifts as a source of receipts. They contend that the funds to build the Gilmer County House were not funds of Larry J. Rogers, but of his father Fred W. Rogers. They contend that the other expenditures made in 1985 and 1986 were from funds given to Larry J. and S. Audrey Rogers by Lela Smith. Petitioners both testified that starting in 1981, after they had come to Atlanta to own and operate the Greenwood Hotel, each year at around Christmastime Larry J. Rogers' great-aunt Lela Smith would call them into her cottage on the hotel grounds and give each of them and each of their two children $ 10,000 in cash. Larry J. Rogers testified that sometimes the children were there and sometimes they were not and their money would be handed to their parents. It is the testimony of both Larry J. Rogers and S. Audrey Rogers that the $ 200,000 given to them in this manner by Lela Smith from 1981 through 1985, and $ 139,000 which *199 S. Audrey Rogers claims she found in a small room in Lela Smith's house, and at her direction took while Lela Smith was in the hospital in her last illness, accounts for the extravagant expenditures they made during the two years here in issue and for some years prior thereto. We do not believe this testimony. We realize that the two Rogers children, Nikki who was 14 years old at the time of the trial and Buffi, who at the time of the trial was 18 or 19 years old and attending Mercer University on a PELL Grant, testified in an attempt to support the testimony of their parents with respect to the gifts of $ 10,000 to each of them around Christmastime of each of the years 1981 through 1985. Other than parroting the fact that their Aunt Lela called them in and made the gifts, neither of these children was able to tell anything about the circumstances of the gifts. We found the testimony of both Nikki and Buffi totally incredible. A 9-year-old girl who went into a great-great-aunt's cottage and was given $ 10,000 in cash would normally be so impressed by the event as to remember many more details than Buffi remembered. Also, Buffi was attempting to carry out cash and jewels for *200 her mother at the time their Riverdale house was seized. Although in her testimony Buffi attempted to say that she thought only her cheerleading outfit was in the bucket she was attempting to carry out, her testimony was so flawed that clearly it was not truthful. The cheerleading pompons were obviously being used to cover up other articles in the bucket. Buffi kept referring to her other cheerleading paraphernalia but there is nothing in this record to support her claim that any cheerleading items other than the pompons were in the bucket. S. Audrey Rogers told the marshals that she had told Buffi to bring out the bucket and that Buffi was not responsible for her acts in attempting to bring it out. However, her testimony with respect to bringing out the bucket was not believable. Certainly her testimony with respect to the gifts from her great-aunt was totally incredible. In addition to the lack of credibility to the testimony offered, if the testimony were true, half of the $ 200,000 would belong to Nikki and Buffi. Other than an $ 8,000 boat that was put in Nikki's and Buffi's name and a hot rod car of some type, the price of which is not shown that Larry J. Rogers said *201 was Nikki's, there is no showing of any benefit the children received from items bought with their money. Therefore, if Larry J. Rogers and S. Audrey Rogers had in fact been given money in any amount by Aunt Lela, half of which belonged to their children, they apparently diverted their children's money to their own purposes. The purchases made by Larry J. and S. Audrey Rogers in years prior to 1985, the first year in issue, though not shown in absolute detail, appear to have been sufficient to absorb most, if not all, the funds claimed to be gifts made by Larry J. Roger's Aunt Lela Smith to the adult Rogers. However, we do not believe the testimony that Lela Smith made gifts in the amount of $ 10,000 each to Larry J. Rogers, S. Audrey Rogers, and each of their two children, each year from 1981 through 1985. Her financial situation, which we have found from the record, would clearly indicate her lack of funds to make such gifts. There is nothing in this record to indicate that Mrs. Lela Smith dealt in cash. In fact, she kept bank accounts and CD's and other than her social security, lived on the interest and investment income she received. There were witnesses that had known *202 Mrs. Smith for a long time who testified of her fear of the neighborhood around the Greenwood Hotel and her use of bank accounts which would support the conclusion that she was very unlikely to have large amounts of cash in her cottage on the Greenwood Hotel grounds. S. Audrey Rogers and the children both testified with respect to other gifts given to them by Lela Smith, but at no time was a gift tax return filed by Lela Smith. Also, the manner in which her estate was left in her will would suggest that she would not have given practically all of her funds to Larry J. and S. Audrey Rogers. She did give them the hotel as well as providing in her will that their indebtedness with respect to the hotel was canceled. However, she left her cash funds to five other heirs. She left her Merrill Lynch account to Nikki and Buffi. Had she made the yearly gifts petitioners claimed she made, she could not have had the funds that she had in banks, CD's, and stock at her death. Based on this record, we conclude that no appreciable cash gifts were made by Lela Smith to Larry J. and S. Audrey Rogers and their two children, Nikki and Buffi, and that the cash available for the various expenditures *203 made by Larry J. Rogers and S. Audrey Rogers in the years here at issue, came from other sources which we conclude from this record were the drug dealings of Larry J. Rogers. Respondent alleged in an amendment to answer that Larry J. and S. Audrey Rogers had an increase of income of $ 1,565,494 in 1985 and Larry J. Roberts had an increase of income of $ 1,548,010 in 1986. This allegation was based on estimates made by a police officer and a DEA officer who had the Greenwood Hotel under surveillance in part of 1985 and part of 1986. These officers testified that while they had the hotel under surveillance 50 to 100 drug customers visited the hotel each day. These officers gave as an opinion that most of the addicts that patronized the Greenwood Hotel would have used approximately five pills a day. The hotel was not under surveillance for either the entire year 1985 or the entire year 1986. Also, it was not under surveillance every day. Although the testimony of these police officers is sufficient to establish a source of income in a substantial amount from drug sales by Larry J. Rogers during 1985 and 1986, it is not sufficient to carry respondent's burden of establishing the *204 much higher income from drug sales alleged in his amendment to answer. We therefore will consider whether the amount of income computed by respondent in the notice of deficiency on a source and application of funds basis has been shown by petitioners to be erroneous. The only items in the application of funds which petitioners question is the cost of the construction of the Gilmer County house. Absent adequate books and records, the source and application of funds method has been held to be an adequate method for computing income and petitioners do not contend to the contrary. We accept this method of computing income and discuss only whether the cost of building the house in Gilmer County was paid by Larry J. Rogers or by his father Fred W. Rogers. Both Larry J. Rogers and Fred W. Rogers claim that Fred W. Rogers used his funds to build the house. Fred W. Rogers claims that he got these funds from his Uncle Woodrow Wilson Green, who shortly before his death gave him $ 60,000 in cash and another $ 10,000 which he had buried on the premises that Fred W. Rogers found. The record here clearly indicates that Woodrow Wilson Green would not have been able to accumulate a sum of $ *205 60,000 in cash to give to Fred W. Rogers and, furthermore, he had other relatives that he might well have had share in any funds he had. Woodrow Wilson Green lived off and on at the Greenwood Hotel and apparently from the testimony was assisted financially by his sister, Lela Smith. We therefore conclude that the record is not sufficient to establish that Fred W. Rogers did in fact have funds received from Woodrow Wilson Green sufficient to have paid the cost of the building of the Gilmer County house. Furthermore, Fred W. Rogers deeded the farm property on which the house was being built to Larry J. and S. Audrey Rogers retaining only a life estate for himself. Had Fred W. Rogers spent his own funds on building the home, he would have been spending his funds to build a house for his son and his son's wife with only a life estate to himself. The record is clear that Fred W. Rogers was not in good health, having had heart surgery and we find it incredible that he would have spent his money in building this house that would, except for a life estate in him, belong to his son and daughter-in-law. Also there is much other evidence to indicate that the cost of building the house *206 was paid by Larry J. Rogers and S. Audrey Rogers and that the house was to belong to them. Larry J. Rogers sent people up to do work on the house and he purchased air-conditioning units for the house. S. Audrey Rogers selected the bathroom fixtures for the house. Based on this record, we conclude that the costs of building the Gilmer County house were paid by Larry J. Rogers with funds he received from his drug business. We recognize that Fred W. Rogers actually made many of the purchases of materials for the house with cash and paid some persons who worked on the house with cash. We conclude however that this cash was supplied to Fred W. Rogers by his son Larry J. Rogers. We therefore sustain respondent's determinations of deficiency as made in the notices of deficiency for Larry J. and S. Audrey Rogers for the year 1985 and for Larry J. Rogers in 1986 except for the small concession as to the cost of the Riverdale house made by respondent. We conclude that the entire deficiency in each of these years was due to fraud with intent to evade tax. Petitioners do not contest the addition to tax under section 6661 aside from their contest of the underlying tax liability. We therefore *207 sustain respondent's determination of the addition to tax under section 6661 as to Larry J. and S. Audrey Rogers for 1985 and Larry J. Rogers for 1986. We sustain respondent's determination of the addition to tax under section 6654 for Larry J. Rogers for the year 1986 since no evidence was introduced by him with respect to this issue. The determination of the tax liability and the addition to tax for fraud of Fred W. and Flora Rogers raises difficult factual questions. Respondent made his determination of the income of Fred W. and Flora Rogers in the notice of deficiency on the basis of source and application of funds. Respondent also determined additions to tax for fraud in the liability of Fred W. Rogers and Flora M. Rogers for each of the years 1985 and 1986. The respondent has the burden of proving fraud on the part of Fred W. and Flora Rogers in each of the years 1985 and 1986 by clear and convincing evidence. Respondent argues that he has established fraud by showing that Fred W. Rogers hid drugs and money for his son Larry J. Rogers on his farm and received payments in return for this service which he failed to report as income. Respondent claims he has shown an understatement *208 of income by showing that the expenditures of Fred W. and Flora M. Rogers during 1985 and 1986 exceeded their sources of income. Upon analyzing the record, we conclude that respondent has failed to make the showings he claims to have made. While some suspicion may arise that either drugs or money was stored by Larry J. Rogers on his father's farm, there is no evidence whatsoever, much less clear and convincing evidence, to show this fact. The only piece of evidence that respondent can point to is that a dog sniffing a place in a haystack reacted in such a way that the indication might be that drugs had at some time been stored there. No drugs were found on the farm. The largest item in the computation of application of funds of Fred W. and Flora Rogers as made by respondent is the cost of building the house on the Gilmer County property near the old homeplace. We have determined that the money for building this house came from Larry J. Rogers out of his drug income. Fred W. Rogers testified that he paid the costs of building this house with money given him in cash by his Uncle Woodrow. As we have previously stated, we do not believe Fred W. Rogers' explanation of the source *209 of the money to build the house. However, our lack of belief of the testimony of Fred W. Rogers does not substitute for the proof respondent must produce to prove fraud. Expenditures in excess of available sources of funds combined with other evidence, might under certain circumstances be an indication of fraud. Under the circumstances here present we conclude that the record shows that Larry J. Rogers supplied the money with which the house was built and that these funds were not supplied by Fred W. Rogers. The fact that the house was built on property in which Fred W. Rogers had a life estate does not establish by the clear and convincing evidence necessary to show fraud that the funds to build the house were income of Fred W. Rogers. For the year 1985 the source of funds for Fred W. and Flora M. Rogers is shown to be $ 11,356 from interest income of $ 9,256 and rental income of $ 2,100. Aside from the $ 136,686 cost of construction of the Gilmer County house, the application of funds consists of $ 17,647 increase in bank accounts and $ 20,512 personal living expenses. The record shows that Fred W. Rogers dealt in cash. In September 1982 he cashed a certificate of deposit *210 and took cash of $ 10,000. In that same month he made a $ 20,000 cash deposit in another account. Respondent has offered no evidence to show the source of the increase in the bank deposits of Fred W. Rogers. Fred W. and Flora M. Rogers lived on a farm and much of their living expenses may have been from the farm. The determination of the living expenses is on the basis of a stipulation that during 1985 Fred W. and Flora M. Rogers had personal living expenses in the amount of $ 20,512. Leaving out the availability of $ 136,686 to Fred W. Rogers to build the Gilmer County house, the differential between the application and source of funds is not sufficient to be clear and convincing evidence of a fraudulent understatement of income. If the $ 40,828 spent on construction of the Gilmer County house is removed from the application of funds in 1986, the source of funds would exceed the application of funds. It is also noted that for the year 1986 a portion of the source of funds is a decrease in bank accounts of $ 24,542, which possibly is only a further indication of the dealings in cash of Fred W. Rogers or it might be the source of most of the amount paid by Fred W. Rogers as *211 legal expenses for Larry J. Rogers. The record here shows that from time to time Fred W. Rogers had sold various items. A sale of a mobile home in 1986 is listed on respondent's source of funds. The record also shows that at some time either in 1985 or shortly before, Fred W. Rogers sold a front-end loader to Claude Bell for $ 5,000. The payment for this equipment was made by work done by Claude Bell on the Gilmer County house. Since we conclude that Larry J. Rogers furnished the funds to build the house, Fred W. Rogers would very likely have been reimbursed in cash for this labor cost. Based on the record in this case, we conclude that respondent has failed to show by clear and convincing evidence that any part of the underpayment of tax, if any, by Fred W. and Flora M. Rogers in either 1985 or 1986 was due to fraud. While the burden is on respondent to show fraud by clear and convincing evidence, petitioners must show error in respondent's determination in the notice of deficiency of their tax liability. The only evidence offered by petitioner in an effort to show error in respondent's determination was the testimony of Fred W. Rogers with respect to cash funds he claims *212 were given to him by his Uncle Woodrow Green. He claims to have used these funds to build the Gilmer County house. We do not believe this testimony. In the first place the $ 60,000, which he claims his uncle gave to him, plus the $ 10,000 he claims to have found, would not be sufficient to pay the costs of the home. The record clearly indicates that Woodrow Green would not have been able to give Fred W. Rogers $ 60,000 in cash. Furthermore, there is testimony in the record with respect to disagreements between Woodrow Green and Fred W. Rogers which would certainly mitigate against any gift of $ 60,000 in cash by Woodrow Green, when he was in bad health, lived much of the time at the Greenwood Hotel and received some assistance from his sister, Lela Smith. We therefore conclude that the record fails to substantiate Fred W. Rogers' claim of receiving cash from Woodrow Green. If the $ 136,686 used to build the Gilmer County house is eliminated from the application and source of funds computation made by respondent in 1985 there would still remain some deficiency in the income tax of Fred W. and Flora M. Rogers for that year. If the $ 40,828 in 1986 is eliminated, no deficiency *213 for 1986 would remain under respondent's computation. Respondent argues that even though we determine that the amount spent on the Gilmer County house originated with and was income of Larry J. Rogers, we should still determine that it was also an amount paid out by Fred W. Rogers for work done on the house and should be included in computing his income. Respondent argues that Fred W. Rogers assisted Larry J. Rogers in his drug operation, but there is insufficient evidence in this record to support such a finding. There is clear evidence that Fred W. Rogers did a great deal of work on the Gilmer County house. Whether income should be credited to Fred W. Rogers for the work he did on the Gilmer County house is difficult to determine. We conclude on the basis of this record that the $ 80,000 paid to the other possible heirs of Woodrow Green came from Larry J. Rogers and originated in earnings from his drug business. Both Fred W. Rogers and Larry J. Rogers testified it came from Lela Smith. For reasons heretofore discussed, we do not believe this testimony. We have also concluded that most, if not all, of the cash cost of building the Gilmer County house came from Larry J. Rogers. *214 The record also shows that in January 1986 the Gilmer County farm was deeded to Larry J. and S. Audrey Rogers with Fred W. Rogers reserving a life estate. Although there is no clear showing of the fact, the inference is clear that the $ 80,000 was supplied by Larry J. Rogers for payment to other heirs in order for Fred W. Rogers to acquire the farm with the understanding that the farm would be deeded to Larry J. Rogers and his wife with a life estate reserved to Fred W. Rogers. On the basis of this record it appears to us that this understanding existed when the $ 136,686 was furnished in 1985 by Larry J. Rogers for construction of this house. The remainder interest had been deeded to Larry J. and S. Audrey Rogers in 1986 when the $ 40,828 was spent. There is nothing in this record that shows the age of Fred W. Rogers in 1985 and 1986. We do note that on his tax returns for those years he did not make a claim for an exemption for being over 65. We also note that in 1985 Larry J. Rogers, his son, was 34 years old. However, from this record we do not have sufficient information to determine what the value of the life estate retained by Fred W. Rogers was or what the value of *215 the remainder interest transferred to Larry J. Rogers and S. Audrey Rogers was. It is possible that some of the money paid toward the Gilmer County house construction by Larry J. Rogers was a further payment for the transfer to him of the remainder interest in the Gilmer County farm after a life estate to Fred W. Rogers. It seems reasonably clear that the payment by Larry J. Rogers of the cost of building this house with a life estate remaining in Fred W. Rogers was to some extent compensation for the work Fred W. Rogers did in building the house. Also since we do not believe any of the testimony of the witnesses with respect to the various transactions here involved, it would be pure speculation to attempt to determine whether some agreement existed between Larry J. Rogers and his father Fred W. Rogers as to the fact that Larry J. Rogers and his family would be the ones to use the new house on the Gilmer County property. Certainly the ultimate use would be theirs, since they had the remainder interest in the property, but there is some indication from the record, particularly with respect to the interest in the construction of the house taken by S. Audrey Rogers, that there was *216 some intent that Larry J. and S. Audrey Rogers use the new Gilmer County house during the lifetime of Fred W. Rogers. There is no clear evidence to this effect. We do conclude that the evidence is sufficient to show that there was some form of agreement with respect to the house, which was built by Fred W. Rogers with some of the actual physical work being done by him. Based on this record and weighing against the taxpayers for their imprecision in showing the actual agreements with respect to the Gilmer County house, we conclude that at least part of the payment made for the construction of the house by Larry J. Rogers with a life estate in the house remaining in Fred W. Rogers was as compensation for the labor done by Fred W. Rogers in the building of the house, which would after the death of Fred W. Rogers, belong to Larry J. Rogers. Without being precise as to dividing the value of the house between Fred W. Rogers' life estate and Larry J. Rogers' remainder interest, it would appear that the value of the work done by Fred W. Rogers would probably be less than an actuarial determination of the value of a life estate in the house if we had the information to make such an actuarial *217 determination. Therefore, the property received by Fred W. Rogers for his work was a life estate in the house which was certainly equal in value to the value of the work he did and probably in excess of the value of such work. However, the excess may have been additional payment for the remainder interest deeded to Larry J. Rogers, or considering the son/father relationship, even a gift. Certainly the work done by Fred W. Rogers in planning and supervising the construction of the house would have a value of around 10 percent of the cost of the house. For the lack of better information to determine the value of the supervisory work done by Fred W. Rogers in connection with the house we have used a value of 10 percent of the cost of the house, or $ 13,668 in 1985 and $ 4,083 in 1986. It is far more difficult from this record to attempt to determine the value of the physical labor done by Fred W. Rogers in connection with construction of the house. The record shows that other workmen were paid $ 7 an hour for work they did on the house. On a 40-hour week, this would have been $ 280 a week. If a person worked 40 hours a week for 50 weeks, the amount would have been $ 14,000 a *218 year. However, the indications from the record are that Fred W. Rogers did not work on this house 40 hours a week for 50 weeks in either year here involved. The building of the house was in effect a spare-time project with him. Considering this evidence along with the other evidence of record, we conclude that in 1985 he would not have done the type of labor for which he was paying others $ 7 an hour for no more than half of the year and therefore add in an extra $ 7,000 making the total which Fred W. Rogers in effect received as income in 1985 for building the house $ 20,668. The work on the house was stopped in 1986 after Larry J. Rogers' arrest. Also the house was nearer to completion in that year. Based on the record as a whole, we conclude that the value of the type of work that would have been worth $ 7 an hour done by Fred W. Rogers on the house in 1986 was $ 5,000, making a total he received with respect to the house in 1986, $ 9,083. Larry J. Rogers received income of $ 136,686 which he spent on the house and part of the expenditure was in effect a payment to his father for the work his father did on the house. The same is true of the $ 40,828 in 1986. We therefore *219 conclude that the $ 136,686 construction cost of the Gilmer County house in respondent's application and source of funds computation of Fred W. and Flora Rogers in 1985 should be removed but that Fred W. Rogers' 1985 income should be increased by $ 20,668 as an amount constructively received for building the house on property in which he retained a life estate when he transferred the remainder interest to Larry J. and Audrey Rogers. We conclude that the $ 40,828 of construction costs of the Gilmer County house in 1986, should be eliminated from the application and source of funds computation of Fred W. and Flora Rogers, but that the amount of $ 9,083 should be added to the 1986 income of Fred W. Rogers as a constructive payment to Fred W. Rogers for his work on the house. We are aware that the constructive payment would of necessity be made by the value of Fred W. Rogers' life estate in the house. Even though we are unable to figure the value of the life estate, the clear indication from the record is that it would exceed the income of Fred W. Rogers for work on the house that we have determined. It may be that there will be no understatement of income by Fred W. and Flora Rogers *220 in 1986 after elimination of the cost of building the house from the source and application of funds computation even though the $ 9,083 received by Fred W. Rogers for work on the house represents additional income. This must be determined in the recomputation of tax for 1986. Petitioner has made no showing of any error in respondent's determination of additions to tax under section 6661, if the recomputation of the understatement of tax meets the criteria in either the year 1985 or 1986 for that section to apply. If the section is applicable in either or both of the years 1985 and 1986 based on the amount of understatement of tax, we sustain respondent's determination of this addition to tax. Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. Section 6653(b)(1)(A) and 6653(b)(1)(B) for the year 1986.↩
*. In the notice of deficiency this amount was stated as $ 207,500, but at the trial respondent stipulated that $ 199,500 was the correct figure.↩
*. This amount was shown on an amended return.↩